UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

--------------------------------------X

MVP HEALTH PLAN, INC.,

                 Plaintiff,          Civil Action No.  1:18-CV-0677
                                                (FJS/CFH)

        v.

                                        **COMPLAINT**

VERSCEND TECHNOLOGIES, INC.,

                                        **JURY DEMAND**

               Defendant.

--------------------------------------X

    Plaintiff MVP Health Plan, Inc. ("MVP"), by and through its undersigned attorneys, as and for its Complaint against Defendant Verscend Technologies, Inc. ("Verscend"), hereby alleges as follows:

## NATURE OF THE ACTION

    1.  MVP seeks a declaratory judgment, equitable relief, and damages in excess of **$70 million** due to Verscend's profound breaches of contract, fraud, and other unlawful conduct.

    2.  MVP is a duly licensed health plan that provides Medicare Advantage health coverage to thousands of New York and Vermont residents.

    3.  In 2008, Verscend contracted with MVP to provide MVP with healthcare consulting, data analysis, data processing, and

reporting services in connection with MVP's Medicare Advantage health benefits plans and MVP's submissions of encounter and risk adjustment data to the Centers for Medicare and Medicaid Services ("CMS"). (As used herein, "Verscend" refers to Verscend and all of its predecessor companies and names).

4.   Verscend profoundly and materially breached its contractual obligations to MVP. Verscend's software algorithms and filtering logic, designed to isolate only those claims that meet CMS submissions criteria, were catastrophically flawed and defective. Verscend knew about it, and did not notify or alert MVP. As a result, MVP's data submitted to CMS was erroneous and lead to a significant overpayment by CMS to MVP.

5.   Additionally, and as understood and intended by the parties, Verscend's data was used to generate bids that MVP submitted to CMS; however, as a result of Verscend's flawed filtering logic, the bid submissions were incorrect, resulting in significant damages to MVP exceeding **$40 million**. Other damages incurred by MVP as a result of Verscend's undisclosed profound breaches and flawed filtering logic included, **$15 million** due to submissions that should have been submitted to CMS but were overlooked by Verscend; **$7 million** due to Verscend's defective attempt to resolve the overpayment issue, which substantially worsened matters; **$8 million** in unnecessary

payments to Verscend for Verscend's worthless services; damages and other irreparable harm to MVP's reputation and good will; and significant burden and expense to investigate and remediate (to the extent possible and allowable) Verscend's improper and unlawful conduct.

6. Verscend's profound and fundamental breaches are exacerbated by the fact that Verscend knew about the errors in its filtering logic and defective services, but intentionally failed to disclose its breaches, flaws, and defects to MVP.

7. Instead, Verscend deceived MVP into signing a new contract with Verscend in April 2017—which included a damages limitations provision. Only and just weeks after this fraudulently induced contract was signed and MVP independently discovered Verscend's breach, did Verscend come clean and admit to its unlawful conduct and knowing breach. Had Verscend done the right thing and disclosed the breach, then MVP would not have signed the new contract with Verscend, thereby avoiding additional damages.

8. The laws and regulations of the United States of America require MVP to report Verscend's breach and flawed filtering logic to CMS. MVP did so in July 2017.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this

action pursuant to U.S.C. § 1332(a) (1) and (2).  The matter in controversy exceeds $75,000 exclusive of costs, and is between citizens of different states.

10.  This district is the proper venue pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred within this district.

## THE PARTIES

11.  MVP is a New York not-for-profit corporation with its principal place of business in Schenectady, New York.  It is a regional health plan servicing enrollees across the States of New York and Vermont, of which approximately 61,000 are currently Medicare Advantage beneficiaries. MVP consistently rates among the nation's top health insurance companies. Relevant to this matter, MVP's Medicare Advantage Plans received star-ratings of 4.5 out of 5.0 stars from CMS.

12.  Verscend is a Delaware corporation, whose principal place of business is located in Waltham, Massachusetts. Verscend purports to provide solutions to payers, providers and employers in the context of CMS risk adjustment, payment accuracy and quality improvement. Verscend is the successor-in-interest to Verisk Health Solutions, Inc., which had acquired Health Risk Partners, Inc., which was the original contracting party with

4

MVP.

**FACTS COMMON TO ALL COUNTS**

**A. The 2008 Master Services Agreement between MVP and Verscend**

13.   In December 2008, MVP entered into the Master Services Agreement (the "2008 MSA") with healthcare technology firm Health Risk Partners, Inc. ("Health Risk") whereby, among other things, Health Risk would provide MVP with risk adjustment services. A true and correct copy of the 2008 MSA is attached as Exhibit A.

14.   Through a series of transactions between June 2011 and August 2016, Health Risk was sold, purchased, renamed, and ultimately rebranded as Verisk Health and then finally as Verscend Technologies, Inc. (i.e., Verscend).

15.   The 2008 MSA set forth the terms whereby Verscend would provide services relating to CMS's Risk Adjustment Processing System ("RAPS"). Verscend also provided operational consulting, data processing, data reporting, chart review and coding services to MVP for Medicare enrollment reconciliation, premium reconciliation and appropriate revenue maximization.

16.   Verscend had a contractual duty to properly, accurately, and reliably process MVP's risk adjustment data and its submissions of the RAPS data to CMS. Verscend's RAPS

5

submission services included data validation of claims to ensure integrity of bill type, revenue codes, procedure codes and place of service codes; and filtering claims data for services appropriate for risk adjustment using Verscend's proprietary algorithm and filtering logic ("Verscend's Logic").

17.  Verscend also had a contractual duty to prepare the data files for submission to CMS and to review the data files for accuracy.

18.  Verscend carried out its contractual duties through the use of Verscend's Logic, among other things.

19.  Generally speaking, the purpose of the RAPS and bidding processes was to capture all appropriate revenue available to MVP from CMS.

20.  Verscend was aware of this purpose at the time it first contracted with MVP and throughout the parties' relationship.

21.  Through Verscend's representations and actions, MVP justifiably believed and relied that Verscend had performed and would perform its contractual duties properly and accurately, and that the services were free from defects and errors.

22.  For example, and among other things, Verscend periodically provided to MVP written confirmation that all aspects of Verscend's RAPS services were properly operating,

accurately provided, and otherwise in good order.

23.  Verscend also represented that it reviewed its filtering logic at least annually to implement any necessary updates through a so-called "sweepback process." From time-to-time, Verscend implemented updates following that process.

24.  Verscend and MVP knew that CMS used Verscend's RAPS data to determine the risk score for each MVP enrollee. Verscend also knew that MVP used and relied upon Verscend's risk scores in MVP's bid submission process; namely, the formulation of bids for submission to CMS.

25.  Verscend's services directly affected MVP's bid submissions to, and payments from, CMS.

26.  Unfortunately, and unbeknownst to MVP, Verscend failed to provide proper, accurate and reliable services. Verscend's RAPS services had serious errors and Verscend's Logic was materially and profoundly flawed and defective. The flaws resulted in the submission of faulty and incorrect data to CMS.

27.  As a result of the faulty data submissions occasioned by the flawed Verscend Logic, MVP's risk scores were erroneous and MVP's bid submissions to CMS were wrong. Verscend's flawed filtering logic and inaccurate RAPS services detrimentally affected MVP.

28.  Verscend's breaches of its contractual obligations are

7

profound and material. The entire purpose of the relationship between MVP and Verscend was for Verscend to provide accurate and reliable risk adjustment services for submission to CMS and for MVP to be able to rely on Verscend's data in connection with MVP's bid submission. Furthermore, Verscend was aware that any bid accepted by CMS would be binding on MVP and directly affect MVP's revenue.

29.  Verscend's undisclosed material breach was ongoing and continuous during the term and performance of the 2008 MSA.

30.  Upon information and belief, Verscend knew of the flaws existing in its filtering logic prior to April 3, 2017, but Verscend negligently, recklessly, knowingly, and intentionally withheld this critical information from MVP.

31.  As a result of Verscend's material breaches of contract, MVP suffered damages.

**B.   The 2017 Service Agreement**

32.  While Verscend's flawed filtering logic and defective services were unknown and undisclosed to MVP, Verscend and MVP signed a new Service Agreement on April 3, 2017 (the "2017 Service Agreement"). A true and correct copy of the 2017 Service Agreement is attached as Exhibit B.

33.  At the time that MVP signed this agreement, Verscend

was in material and substantial breach of the 2008 MSA, but Verscend had not disclosed this breach to MVP.

34.   The 2017 Service Agreement (like the 2008 MSA) provides that the services to be provided by Verscend would be referenced in separate written Statements of Work ("SOW").

35.   The parties unequivocally intended to enter into SOWs in order to effect the 2017 Services Agreement and set forth the duties to be performed under the 2017 Services Agreement. The SOWs were expressly and unambiguously intended to set forth the material terms of the 2017 Services Agreement, including the scope of services to be performed.

36.   The parties never entered into any SOW. Accordingly, the 2017 Service Agreement never came into effect and does not govern the parties' respective obligations to one another. Instead, Verscend continued to provide the same services it had provided to MVP since about 2008.

37.   Unlike the 2008 MSA, the 2017 Service Agreement contains a limitation of damages provision. Section V of the 2017 Service Agreement, provides:

> THE PARTIES AGREE THAT NO DIRECTOR, OFFICER, EMPLOYEE, AGENT, OR VOLUNTEER OF EITHER PARTY SHALL INCUR ANY FINANCIAL RESPONSIBILITY OR LIABILITY IN CONNECTION WITH THIS AGREEMENT.
>
> NOTWITHSTANDING ANYTHING TO THE CONTRARY, OR ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED

9

REMEDY, EVEN IF ADVISED OF THE POSSIBILITY OF
LOSSES, IN NO EVENT SHALL EITHER PARTY, OR ITS
AGENTS, BE LIABLE FOR ANY CONSEQUENTIAL,
INCIDENTAL, INDIRECT, TREBLE OR SPECIAL DAMAGES,
INCLUDING ANY LOST PROFITS, DATA, BUSINESS, GOOD
WILL, ANTICIPATED SAVINGS, OPPORTUNITY OR USE OR
OTHER WHETHER IN CONTRACT (INCLUDING BREACH OF
WARRANTY) OR TORT, AND INCLUDING, BUT NOT LIMITED
TO, LOST PROFITS OR OTHER ECONOMIC LOSS.

LIABILITY CAP. NOTWITHSTANDING ANYTHING TO THE
CONTRARY, OR ANY FAILURE OF ESSENTIAL PURPOSE OF
ANY LIMITED REMEDY, NEITHER PARTY'S AGGREGATE
LIABILITY, IF ANY, TO THE OTHER OR TO ANY THIRD
PARTY FOR CLAIMED LOSS ARISING UNDER THIS
AGREEMENT AND THE INCORPORATED BUSINESS
ASSOCIATES AGREEMENT, SHALL EXCEED SEVEN TIMES
FEES PAID OR PAYABLE BY MVP FOR THE PRIOR 12
MONTH PERIOD PRECEDING THE CLAIM.

## C. MVP Discovers Significant Errors in Verscend's Data

38.   Shortly after the 2017 Service Agreement was signed on
April 3, 2017, MVP discovered some of Verscend's filtered data
included unique diagnosis codes submitted from ineligible
providers and/or sites of services, including, but not limited
to, an acupuncturist, independent laboratory, durable medical
equipment, and radiology facility.

39.   That data was faulty and should not have been
submitted to CMS as it could and did lead to erroneous risk
adjusted scores.

40.   On April 14, 2017, MVP alerted Verscend of the errors,
but Verscend did not meaningfully respond for weeks.

41.   Finally, over a month later, and during a telephone conference on May 18, 2017, Verscend advised MVP that the Verscend Logic suffers from a profound fault and that Verscend used its faulty process with respect to the services it performed for MVP, including MVP's RAPS submissions.

42.   Verscend had been aware of the defect and flaw in the Verscend Logic prior to April 3, 2017.

43.   During the May 18, 2017 teleconference, Verscend admitted that Verscend had been reviewing its filtering logic for a period of time prior to MVP's April 14, 2017 alert.

44.   Among other items, Verscend identified 75 CPT codes that should not have been included in its proprietary filtering logic, which resulted in numerous improper diagnoses codes being submitted to CMS.

45.   Additionally, Verscend confirmed to MVP that the same flawed filtering logic had been in use for many years.

**D. MVP Informs CMS of Verscend's Errors and Omissions**

46.   Federal laws and regulations required that MVP inform CMS of Verscend's material and profound data errors.

47.   On July 14, 2017, MVP met with CMS to discuss the data errors, the resultant overpayment and the next steps necessary to correct the errors that Verscend caused.

48.   Verscend's assistance was critical to correct the

11

errors through, among other things, the deletion of certain files submitted to CMS for the relevant dates of service ("delete files") and a financial impact analysis for each plan year.  However, Verscend failed to meaningfully participate. Instead, Verscend provided limited assistance through the preparation of "delete files"; but like Verscend's other services, the delete files were incorrect and flawed.

49.  As a result of Verscend's continuing failures, it became necessary and prudent for MVP to hire a third party vendor to assist with this process.

50.  The third party vendor determined that Verscend's attempts to correct the filtering errors were flawed. Verscend deleted diagnostic codes that should not have been deleted, and Verscend failed to include diagnosis codes that should have been included in the delete files.

51.  CMS would only allow some, but not all, of Verscend's errors to be corrected and adjusted.

52.  As a result of Verscend's foregoing conduct, MVP has been harmed MVP and caused to suffer damages.

## COUNT I
### (Fraudulent Inducement)

53.  MVP repeats and realleges each and every allegation set forth above as if fully set forth herein.

12

54.   Verscend fraudulently induced MVP into signing the 2017 Service Agreement through Verscend's material omissions of material facts to MVP: namely, Verscend failed to disclose that Verscend's filtering logic and RAPS services were defective.

55.   Verscend intended that MVP rely upon Verscend's material omissions of fact and silence, and upon such reliance, sign the 2017 Service Agreement.

56.   MVP justifiably, reasonably, and detrimentally relied upon Verscend's silence and omission of facts, and upon such reliance MVP signed the 2017 Service Agreement.

57.   If Verscend had disclosed the material facts of its flawed and defective RAPS services and filtering logic, then MVP would not have signed the 2017 Service Agreement.

58.   Since the parties never entered into a SOW as anticipated by the 2017 Service Agreement, the 2017 Service Agreement never became effective.

59.   Neverthless, Verscend fraudulently induced MVP to sign the 2017 Service Agreement, and the 2017 Service Agreement should be rescinded.

60.   MVP has been damaged and otherwise harmed by Verscend's foregoing conduct.

<u>COUNT II</u>

**(Declaratory Judgment)**

61.   MVP repeats and realleges each and every allegation set forth above as if fully set forth herein.

62.   A justiciable controversy exists between the parties concerning the effect of the limitation of damages provisions in Section V of the 2017 Service Agreement.

63.   The limitation of damages provision is null and void.

64.   First, the 2017 Service Agreement, including its damages limitation, is ineffective because the parties never executed any SOWs to which the 2017 Services Agreement or its damages limitations provision could apply.

65.   Second, the 2017 Service Agreement is void and should be rescinded due to Verscend's fraudulent inducement, fraud, and profound undisclosed breach of the 2008 MSA.

66.   Even if the 2017 Service Agreement were effective, and it is not, or the 2017 Service Agreement were not the product of a fraudulent inducement, and it was, then the limitation of damages provisions only apply prospectively to breaches of contract that would occur **<u>after</u>** the 2017 Service Agreement's effective date and for services rendered pursuant to the 2017 Service Agreement. Any and all breaches of contract and other unlawful conduct that occurred **<u>before</u>** the 2017 Service

14

Agreement's effective date is not subject to the limitation of damages provisions in Section V of the 2017 Service Agreement.

67.   Thus, as an alternative to the total rescission of the 2017 Service Agreement, MVP seeks a judicial declaration that limitation of damages provisions in Section V of the 2017 Service Agreement apply only to those damages arising from the 2017 Service Agreement and overall that the 2017 Service Agreement does not govern the parties' respective obligations.

### COUNT III
### (Breach of Contract - 2008 MSA)

68.   MVP repeats and realleges each and every allegation set forth above as if fully set forth herein.

69.   The 2008 MSA constitutes a valid and enforceable contract between MVP and Verscend.

70.   Verscend materially breached the 2008 MSA.

71.   MVP has performed all of its duties under the 2008 MSA and is not in default of any such duties.

72.   As a direct and proximate result of Verscend's material breach of the MSA, MVP has sustained and continues to sustain damages and other harm.

73.   Among other things, **and at minimum**, Verscend's breach has caused MVP to suffer significant business and financial losses, including but not limited to:

a. $40.6 million in foregone revenue that MVP would have been entitled to for bid years 2013-2017, had Verscend prepared and submitted the correct data supporting MVP's Medicare Advantage bids to CMS;

b. $7 million stemming from Verscend's improper deletion of codes that should not have been deleted in connection with MVP's attempts to resolve the overpayment issues with CMS;

c. $15 million due to submissions that should have been submitted to CMS but were overlooked by Verscend;

d. $8 million paid to Verscend for its worthless and defective services;

e. Damages and other irreparable harm to MVPs' reputation and good will; and

f. Other costs and professional fees.

## COUNT IV
### (Breach of Covenant of Good Faith & Fair Dealing – 2008 MSA)

74.  MVP repeats and realleges each and every allegation set forth above as if fully set forth herein.

75.  The 2008 MSA contains an implied covenant of good faith and fair dealing that mandates Verscend shall do nothing that would prevent MVP from receiving the fruits and benefits of the 2008 MSA.

16

76.  Verscend, through its wrongful conduct, including but not limited to its acts of concealment described above, prevented MVP from receiving the fruits of the 2008 MSA for which MVP bargained and for which MVP paid.

77.  As a direct result of Verscend's breach of the covenant of good faith and fair dealing implied in the 2008 MSA, MVP has sustained and continues to sustain damages.

<u>COUNT V</u>
**(Breach of Contract – 2017 Service Agreement)**

78.  MVP repeats and realleges every allegation set forth above as if fully set forth herein.

79.  MVP signed the 2017 Service Agreement under false pretenses. MVP would not have signed the 2017 Service Agreement had Verscend conducted itself honestly, ethically, or reasonably under the circumstances. Therefore, the 2017 Service Agreement should be rescinded and voided in its entirety.

80.  Alternatively, Verscend's material breach of the 2017 Service Agreement is so substantial and fundamental that it defeated the purposes and objective of the 2017 Service Agreement such as to render it null and void.

81.  MVP justifiably terminated the 2017 Service Agreement after learning about Verscend's material and profound breach and reporting it to CMS.

82.  As a direct and proximate result of Verscend's material breach of the Service Agreement, MVP has been harmed and damaged, and MVP has no adequate remedies at law.

## COUNT VI
### (Breach of the Covenant of Good Faith & Fair Dealing – 2017 Service Agreement)

83.  MVP repeats and realleges each and every allegation set forth above as if fully set forth herein.

84.  The 2017 Service Agreement contains an implied covenant of good faith and fair dealing that mandates Verscend shall do nothing that would prevent MVP from receiving the fruits and benefits of the 2017 Service Agreement.

85.  Verscend, through its wrongful conduct, including but not limited to its acts of concealment described above, prevented MVP from receiving the fruits of the 2017 Service Agreement for which MVP bargained and for which MVP paid.

86.  As a direct result of Verscend's breach of the covenant of good faith and fair dealing implied in the 2017 Service Agreement, MVP has sustained and continues to sustain damages, and MVP has no adequate remedy at law.

## COUNT VII
### (Unjust Enrichment)

87.  MVP repeats and realleges each and every allegation

18

set forth above as if fully set forth herein.

88.  To its detriment, MVP conferred to Verscend significant financial benefits and remuneration to Verscend for Verscend's defective and flawed services that have caused harm to MVP.

89.  Verscend obtained and unlawfully retained direct financial benefits from MVP.

90.  Verscend has no justifiable reason to retain these financial benefits.

91.  MVP may not have an adequate remedy at law.

WHEREFORE, plaintiff MVP hereby demands judgment in its favor and against defendant Verscend as follows:

  a. For compensatory damages, including all direct and consequential damages flowing from Verscend's breach of contract, fraud and unlawful conduct, in an amount in excess of $70 million;

  b.  Punitive damages;

  c. Rescinding the fraudulently induced 2017 Service Agreement;

  d. Declaring that the 2017 Service Agreement is null, void, and ineffective;

  e. Declaring that Section V. of the fraudulently induced 2017 Service Agreement does not apply to any

19

damages MVP incurred as a result of Verscend's breaches of contract, fraud, and other unlawful conduct;

f. Alternatively, declaring that Section V. of the fraudulently induced 2017 Service Agreement does not apply to any damages MVP incurred as a result of Verscend's breaches of contract, fraud, and other unlawful conduct that occurred prior to April 2017;

g. Disgorging any financial benefits or gains unlawfully or unjustly retained by Verscend, believed to be in an amount in excess of $8 million;

h. For attorneys' fees and costs and interest; and

i. For any and all other and further relief that the Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff MVP demands a trial by jury on all issues so triable.

Dated: New York, New York
June 8, 2018

By: /s/ Robert M. Travisano
    Robert M. Travisano, Esq.
    Bar Number: 70087

20

Attorney for Plaintiff,
MVP Health Plan, Inc.


EPSTEIN, BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
Tel:(973) 639-8289
Fax: (973)639-8930
E-mail: rtravisano@ebglaw.com


Anthony Argiropoulos, Esq.
Attorney for Plaintiff,
MVP Health Plan, Inc.

EPSTEIN, BECKER & GREEN, P.C.
150 College Road West
Suite 301
Princeton, New Jersey 08540
Tel:(609)455-1541
Fax: (609)228-5267
E-mail: Tel:(973) 639-8289
Fax: (973)639-8930
E-mail:aargiropoulos@ebglaw.com
    (pro   hac   vice   application
    forthcoming)

21